In re Petition of James Nicholls. Appeal of James Nicholls.

*Deed—Lost deed—Evidence—Delivery.*

On a petition to restore a deed alleged to have been given by a father to a son, and subsequently lost, the evidence must be clear and satisfactory of not only the existence of the deed, but also of the fact that it was delivered; and if the son merely shows from the declarations of his father and other evidence that such a deed existed, but utterly fails to prove a delivery, his petition will be dismissed.

There is no delivery of a deed from father to son and a leaving thereof in the father's hands for safe-keeping merely, where the father shows the son the deed, and the latter, after taking it in his hands and looking at it, hands it back, and tells his father to keep it and what he had, as long as he lived, to which the father replied that he would do just as the son said.

In decreeing the reproduction of a lost deed we are virtually establishing title to land by parol and the proofs should therefore be as explicit as in the case of the specific enforcement of a parol sale under the statute of frauds and perjuries. Per ARCHBALD, P. J.

Argued Feb. 22, 1899. Appeal, No. 346, Jan. T., 1898, by James Nicholls, from decree of C. P. Lackawanna Co., Sept. T., 1897, No. 433, dismissing petition to restore a lost deed. Before STERRETT, C. J., GREEN, MITCHELL, DEAN and FELL, JJ. Affirmed.

Petition to restore a deed alleged to be lost.

ARCHBALD, P. J., filed the following opinion:

This is a proceeding to restore a lost deed under the several acts of assembly relating to that subject. The claim of the petitioner, James Nicholls, as set out in his bill, is that on or about July 29, 1880, his father, Dr. Hiram Nicholls, who was the owner of certain land in South Abington township, in this county, by deed duly executed and acknowledged, conveyed to him two certain tracts of land, described in the petition, of forty acres each, one known as the Rose lot, and the other sometimes spoken of as the Edwin Stone lot. This deed it is alleged was in consideration of natural love and affection and the nominal sum of $1.00, and was delivered the same day it was executed, but not having been recorded has since been lost, and resort is therefore made to the statute to reproduce it.

Without regard to the evidence brought forward to refute it we have no hesitation in saying that the evidence produced on the part of the petitioner is not of the character to sustain the proceeding.  The first thing to be noted with regard to it is that, assuming that while standing alone and uncontradicted, it might warrant the conclusion that at one time a deed to the petitioner from his father for the land in controversy had perhaps been made it does not prove the existence of the deed set forth in the petition.  The deed there described is one bearing date July 29, 1880, or thereabouts; but according to the testimony of the petitioner there was a deed in existence as early as 1869, and this was the same one he saw again in 1885 upon his return home from the West after an absence of ten years; and, identified as this is by the signature of Esquire Hall, the justice before whom it is said to have been acknowledged, it must be regarded as the same deed said to have been seen by Andrew S. Meyers, a year later in August, 1886.  In fact, as any one deed duly executed and delivered would be as effective to convey the land as half a dozen, we are warranted in concluding that if there ever was a deed of the character contended for, the same deed is referred to by all the witnesses who speak of any, and this could not have been a deed of the date given in the petition which is that which we are asked to restore.

But the discrepancy in dates is the least to be said with regard to this evidence.  The most serious thing about it is that it establishes no delivery.  The petitioner is bound to prove not only the existence of the deed described, but also that it was delivered to him, and this he has utterly failed to do.  Much of the evidence which he has produced discloses nothing more than a benevolent purpose entertained by Dr. Nicholls to give his son James by deed or will some part of the land in controversy, other land by the same course to be given to his son Asa's family.  George Meyers, for instance, testifies to a conversation with Dr. Hiram Nicholls some thirty-five years ago, in 1861 or 1862, in which he said that he intended that James Nicholls should have forty acres of the Rose land.  Thomas L. Norton also states that in 1875 he had a conversation with Dr. Nicholls in which the latter, referring to the land which he owned, said that he should give the first forty acres now named in the bill to Asa's wife and children and that his son Jim should have

the balance; further, that he had often heard Dr. Nicholls speak of the rest of the land outside of the forty acres as Jim's, and that he said that he had deeded one part to Asa's family and the other to Jim.   E. G. Meade also testifies to overhearing a conversation, about fourteen years ago, in which Dr. Nicholls stated that there was a deed for James Nicholls for the Rose property and that he left the other forty acres to Asa's wife and child. W. N. Clark, another witness, says that in May, 1884, Dr. Nicholls said he wished Jim would come home; that he wanted him to go to work on the Rose lot; that when he (the doctor) was gone they would find two deeds, the first forty acres going to Asa's family and the balance to Jim.   Lastly, Ezra Vosburg testifies that about nine or ten years ago, and it may be longer, he was at work one day on an adjoining piece of land to that in question, when Dr. Nicholls came up and, falling into a conversation with him, he told the doctor he would like to buy four or five acres on account of the spring there was upon it, to which the doctor replied that he did not want to sell it because he expected his son Jim home.   All this it will be noted amounts to little in the present controversy.   Even though a deed may be hinted at in some of it, upon the vital question of whether one was actually executed and delivered it is entirely silent.

One witness, however, Andrew S. Meyers, has something to say which no doubt goes a little further.   He says he was present at Dr. Nicholls's house on one occasion in August, 1886, not long before the doctor died, and heard him say that he had deeded the two Rose lots to his son James.   Ziba Vosburg, who was also there but is now dead, asked if the deed had been made out, to which Dr. Nicholls replied by taking out a leather pocketbook and producing a paper which he handed to Vosburg to read, and he handed it to the witness.   Dr. Nicholls's name was signed to it and so was that of Sarah Nicholls, and it was acknowledged before Mr. Hall, a justice of the peace; he is uncertain at first as to whether this was a deed or will, but finally settles down upon a deed but cannot give the date of it.   Vosburg asked the doctor if that was all he was going to give to Jim, and he replied that it was a very valuable piece of land or would be shortly.   Vosburg then asked why he did not give it to him, and Dr. Nicholls answered that he did give it but Jim gave it back to keep as long as he lived.   To get at

the real force of this evidence, however, we must look into the testimony of the petitioner himself, which, while clearly incompetent as to anything that occurred in the lifetime of Dr. Nicholls may be referred to, to see how much stress is to be laid upon the statement of Meyers as well as to show from the petitioner's own mouth how utterly untenable his whole claim is. His story in substance is that after his return home from the West, in April, 1885, his father one day went to his bedroom and came out with some papers in his hand, and taking him out to the barn untied the roll and handed him one out of the bundle, saying, " This is a deed for the Rose property and the balance," referring by the latter to the Stone tract. The petitioner took the deed in his hand but did not read it fully ; he saw, however, his father's and mother's signature and the name of H. V. Hall, the justice of the peace before whom it was acknowledged; it was the same deed he had previously seen in 1869. " I says to him," continues the petitioner, " ' this is the same deed you showed me once before,' and he says, ' Yes, the same deed.' " This deed conveyed the Rose lot and the Edwin Stone tract from his father and mother to himself. He handed it back to his father and told him to keep it and keep what he had as long as he lived, to which his father answered, " I will do just as you say." The filial suggestion so made and his father's acquiescence in it entirely dispels the idea of a delivery, nor can it now be claimed as it is that by this course the deed was left in Dr. Nicholls's hands for safe-keeping merely. It was tendered and refused, if we believe his testimony, and being put aside in this way, from however commendable a motive, it remained in the hands of the grantor, undelivered and inoperative, and nothing can now be taken under it. All this at the most would go to show them that it is not a lost deed but an undelivered one that we have to deal with, if anything, and that is virtually no deed at all.

If these are the conclusions to be reached from an examination of the petitioner's evidence, much more are we confirmed in them when we look at that which is produced to meet it. That Dr. Nicholls intended to do something for his son upon his return home may be conceded; it appears not only in the petitioner's evidence but in that of the respondent as well, and was to be expected from the relations between them. But that

he had already before that executed and delivered to his son, a deed for the property now claimed, is clearly not the case. He had before that time conveyed lots to other parties from the Edwin Stone tract; in April, 1869, to John S. Singer, about an acre; in October, 1879, to Mary Carmody, about an acre; and in March, 1882, to Edward Gillespie, another acre; while on December 17, 1885, he executed to Flora A. Nicholls, the respondent, a deed for the whole forty acres of the Rose lots. Furthermore, by his will bearing 'date September 21, 1886, a few days before his death, he disposed of all his other real estate, including the Stone tract, to his four daughters, the division of it to be made by his executor, which has since been done. This was an exercise of absolute ownership over all the property now claimed which is entirely inconsistent with the allegation that he previously conveyed it to his son James.  The fact is, according to the other evidence, that the benevolent purpose of the father towards this son was thwarted by the conduct of the latter after his return.   W. S. Frace testifies to a conversation with Dr. Nicholls soon after this: James, it seems, had left his brother Asa's, where he had stayed for a little while, and gone to live with Nelson Clark, whom the father considered unfriendly to him, if not a direct enemy.  Dr. Nicholls felt hurt at this and wanted his son to come away from Clark's and go to work; on the occasion of the conversation referred to, Dr. Nicholls came into Mr. Frace's store and said: "Will, I am mad . . . . I have been insulted. . . . I told him (referring to his son James) if he came home and went to work that I would give him a deed of the Rose lot of forty acres and buy him a pair of mules and set him to work, . . . . and he said, 'If you give me those forty acres I will sell them so quick I will make your head swim.'"   C. E. Weise also overheard a conversation of similar import in August, 1885, in which Dr. Nicholls said that he had intended to give his son James forty acres of the Rose lot when he came back from the West, together with ten head of cattle and a span of horses; that he wanted him to go to work on the Rose lot and clear it up and after that he would give him a deed for it, but James asked for the deed right away; the doctor had heard, however, that he had said he would sell the land so quick it would make his father's head swim; and, "My head is not going to swim," said the doctor, "and I am

going to give that land to my son Asa's wife." That Dr. Nicholls should have considerable feeling as the result of such remarks is not to be wondered at, and that the feeling so engendered continued to his death is shown by the testimony of Andrew J. Smith, who states that when he came to draw Dr. Nicholls's will the doctor plainly said that " he should give Jim nothing," and that " he tried to do something for him but he was unworthy of it."

In the face of this testimony it is useless to press this petition upon us. In a case of this character the evidence must be clear and satisfactory in all essential points. In decreeing the reproduction of a lost deed we are virtually establishing title to land by parol, and the proofs should therefore be as explicit as in the case of the specific enforcement of a parol sale under the statute of frauds and perjuries : Good's Petition, 1 Dist. Rep. 569. Even conceding then that certain parts of the evidence before us, if believed, might be sufficient standing alone to suggest the existence at one time of a deed from Dr. Nicholls to his son, yet taking all the evidence together we have, to say the least, serious doubts upon the subject. But what is decisive of the matter, if there ever was a deed, it is very plain that it was not delivered, and if that be so it might just as well never have been made.

Entertaining these views there is nothing for us to do but dismiss the proceedings. An issue has been asked for but we cannot allow it. The statute casts upon the court the duty of disposing of the case and, even if it were within our discretion to call in the aid of a jury, we feel abundantly able in the present instance to deal with the facts ourselves.

The petition is dismissed at the cost of the petitioner.

*Error assigned* was the decree of the court, dismissing the petition.

*A. A. Vosburg,* with him *Charles W. Dawson,* for appellant. —It seems plain, under the authorities, that there was a legal delivery of this deed : Blight v. Schenck, 10 Pa. 285; Lloyd v. Bennett, 8 C. & P. 124; Garnons v. Knight, 5 B. & C. 671; Walker v. Walker, 42 Ill. 311; Rogers v. Carey, 47 Mo. 232; Kidner v. Keith, 109 Eng. Common Law Rep. 34; Dietz v.

Farish, 79 N. Y. 520; Leppoc v. Nat. Union Bank, 32 Md. 136; Hawkes v. Pike, 105 Mass. 560; Elmore v. Marks, 39 Vt. 538.

The validity of a delivery, to take effect on the happening of some event, is well settled by authority: Whyddon's Case, Cro. Eliz. 520; Chipman v. Tucker, 38 Wis. 43.

The statements claimed to have been made by Dr. Nicholls after he had "signed, sealed and delivered," the deed formally, before the justice of the peace, and had thus parted with his title to the land in question, were inadmissible, and should not have been considered by the court: McLaughlin v. McLaughlin, 91 Pa. 462; Noel v. White, 37 Pa. 514.

*M. J. Martin* and *John F. Scragg*, for appellees.—The witness ought to swear to the contents of the lost paper with such accuracy that no doubt should be left of the character and scope of the instrument: Bolton's Est., 3 Pa. Dist. Rep. 268; Good's Petition, 1 Pa. Dist. Rep. 569; Logan v. Gardner, 136 Pa. 588.

To authorize memoriter proof of any lost document, the witness must have read it or heard it read, or otherwise have actual knowledge of it, and be able to speak at least the substance of the contents: Richards's App., 122 Pa. 547; Coxe v. England, 65 Pa. 212; Ross v. Baker, 72 Pa. 186; Cadwalader v. App, 81 Pa. 194.

The evidence showing the contents of a lost deed or paper should come up in kind and degree to the requirements of a chancellor moved for a decree: Brawdy v. Brawdy, 7 Pa. 157; Hayes's App., 123 Pa. 110.

PER CURIAM, March 13, 1899:

The evidence relied on by the petitioner to establish the fact of execution and delivery, by his father to him, of the alleged lost deed, etc., falls far short of the kind and degree of proof necessary to warrant any decree in his favor; and hence the court below was clearly right in dismissing the petition at his costs. We find nothing in any of the specifications of error that would warrant a reversal of the decree; nor do we think that either of them requires discussion.

For reasons given in the opinion of the learned trial judge the decree is affirmed and the appeal dismissed at appellant's costs.